The **INSTITUTE FOR the DEVELOPMENT OF EARTH AWARENESS, Plaintiff,**

v.

**PEOPLE FOR the ETHICAL TREATMENT OF ANIMALS, Defendant,**

**People for the Ethical Treatment of Animals, Counterclaim–Plaintiff,**

v.

**The Institute for the Development of Earth Awareness and Marjorie Spiegel, Counterclaim–Defendants.**

**No. 08 Civ. 6195(PKC).**

United States District Court, S.D. New York.

March 10, 2011.

David Leichtman, Hillel Ira Parness, Oren Dov Langer, Robins, Kaplan, Miller & Ciresi, LLP, New York, NY, for Plaintiff and Counterclaim–Defendants.

Roger L. Zissu, Jason Douglas Jones, Fross Zelnick Lehrman & Zissu, P.C., New York, NY, Philip Jay Hirschkop, Hirschkop & Associates, P.C., Alexandria, VA, for Defendant and Counterclaim–Plaintiff.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge:

The Institute for the Development of Earth Awareness ("IDEA") has brought this action against the People for the Ethical Treatment of Animals ("PETA"), alleging that PETA has infringed IDEA'S copyrighted work *The Dreaded Comparison,* authored by Marjorie Spiegel. The work purports to draw close parallels between forms of human oppression, most notably, slavery in America and the present-day treatment of animals. PETA is said to have infringed the copyright by publishing a series of WebPages and display boards comparing animal treatment to slavery and other human oppression, as part of PETA's "Animal Liberation Project," or *"ALP."*

The lengthy and contentious discovery period has closed and PETA has moved for summary judgment on a variety of grounds. For the reasons explained herein, the motion is granted. Assuming all other elements of a valid copyright infringement claim are met, no reasonable jury could conclude that PETA has actually copied IDEA's copyrighted work. No

reasonable jury could conclude that PETA engaged in unprotected copying of particularized expression, or copied an original combination of unprotected elements.

BACKGROUND

For the purposes of this motion, only facts not disputed by the non-movant, IDEA, are accepted as true. All reasonable inferences are drawn in favor of IDEA.

The copyrighted work, *The Dreaded Comparison ("TDC")*, was authored by Marjorie Spiegel in 1988.[1] It is a softcover book that is 128 pages in length, with a foreword by Alice Walker, author of the famous novel *The Color Purple* (1982). *TDC* is a work with 86 endnotes referencing source materials. The work also contains a listing of recommended readings, a table of contents and an index. The inside back cover solicits membership in IDEA and donations.

*TDC* describes many of the characteristics of the enslavement of Africans in America, including: painful journeys (e.g., the Middle Passage), high mortality, profit motives of slave-owners, auctions, painful punishment of slaves, branding, secrecy surrounding abuses, separation from other family members, use of language of oppression and the power structure between slave-owner and slave. There is a quote from novelist Zora Neale Hurston asserting in colorful language that African American women were treated like mules. (*TDC* at 109.) The work also discusses the 19th century slaughter of natives of Patagonia, and states that it is "much like the scenario in North America's Midwest." (*TDC* at 89.) It also speaks in several places of Native Americans' respect for animals. (*TDC* at 15–16, 64.) *TDC* also discusses the characteristics of ownership and treatment of various species of animals in modern society, including: painful transportation, cruelty, vivisection, auctions, experimentation,[2] branding, hunting, profit motives of animal owners, use of language of oppression and power over the animal. *TDC* develops its themes and ideas over many pages of original text. It draws from many sources, including religious doctrines, social theory and trends, and contains many historical references. The work purports to be a factual account of actual events and practices with the author's interpretation of them.

*TDC* contains black and white photographs and illustrations of both slavery and the treatment of animals. IDEA does not claim copyright ownership in the individual depictions. There is no consistency in how the illustrations are presented. Some depictions have comparison illustrations, one from slavery and one relating to animals, either on the same page (*see e.g.,* *TDC* at 42, 53, 81, 84) or on pages that face each other. (*See e.g.,* *TDC* at 36–37, 54–55, 66–67, 68–69, 88–89, 92–93, 96–97, 100–01.) Others are presented in a stand-alone manner with no comparative illustration. (*See e.g.,* *TDC* at 39, 41, 51, 56, 63, 74.)

*TDC* also contains about 65 quotations from well known and historical figures, including: St. Thomas Aquinas, Frederick Douglass, Harriet Beecher Stowe, John Stuart Mill, Roger B. Taney, Mark Twain,

1. The first edition was published in 1988; a second edition was published in 1989 and a revised and expanded edition was published in 1996. The parties have tendered the complete 1996 edition on this motion. The *TDC* is found as Exhibit 6 to the Zissu Declaration. For ease, it will be referred to as *"TDC* at ——."

2. The author draws a comparison between animal experimentation and the 20th century Tuskegee Syphilis Study, which examined the effects of untreated syphilis on a population consisting largely of poor African Americans. (*TDC* at 69–70.)

William Pitt, Zora Neale Hurston, J.R.R. Tolkein, Dick Gregory and Peter Singer. Some quotes are in block-quote form with original text before and after. (*See e.g., TDC* at 18, 34, 35, 56.) In many other instances the quotes stand apart from text, including at the beginning of a chapter. (*See e.g., TDC* at 15, 51, 79.) Many other quotes are assembled in a portion of the book titled "What Others Have Said." (*TDC* at 107–113.) No copyright is claimed in the individual quotations.

According to PETA, its "Animal Liberation Project" ("*ALP* ")[3] was an outgrowth of a 2004 campaign titled "Holocaust on Your Plate," "comparing animal mistreatment to Nazi Holocaust victims." (Carr Decl. ¶ 5; Reiman Decl. ¶ 5.)[4] PETA's *ALP* is not a single work, but rather, a series of WebPages posted principally from September 2005 to September 2006 and from April 2008 until November 2009. Some of the *ALP* content was also displayed on enlarged poster boards at PETA events. In part, the *ALP* is used to solicit donations.

PETA's *ALP* has separate WebPages for the topics of "Slavery," "Native American Genocide," "Oppression of Women" and "Children's Welfare." (*ALP* at 1.) The "Slavery" page refers to the branding of slaves and animals, the oppressive mentality of slave-owners and animal oppressors, beatings, lynchings, burnings and the Tuskegee Syphilis Study. (*Id.* at 3.) There are two quotations on the slavery page: one from a PBS televised special and the other from Peter Singer, author of the book *Animal Liberation.* The Peter Singer quote also appears in *TDC*. The quote in *TDC* is approximately 59 words in length and is attributed to Singer with a

date of 1974. (*TDC* at 15.) The quote in *ALP* repeats approximately 29 of those words. (*ALP* at 3.) Notably, more than a decade before *TDC*, Singer in 1974 is said to have "compared" the treatment of animals to the "centuries of tyranny by white humans over black humans." (*TDC* at 15; *ALP* at 3.) *ALP's* "Native American Genocide" page refers to the brutal treatment of native peoples, but in no specific geographic location. (*ALP* at 4.) The "Oppression of Women" page contains statements such as, "[t]he idea that women were inferior to men was generally accepted by society, and they were admonished to be submissive and obedient." (*Id.* at 5.)

The *ALP* relies heavily on color, images and graphics. A few pages have several paragraphs of text (*see e.g.,* ALP at 3, 18–22), but most pages contain a single quote or a paragraph or two of text. (*See e.g., ALP* at 11, 27, 33.) One web version of *ALP* uses the tag line: "We Are All Animals," and opens with the following paragraph:

> What is the common link between all atrocities in our society's past? Shameful chapters of history, such as the African slave trade, the massacre and displacement of Native Americans, the oppression of women, and forced child labor, were the products of a dangerous belief that those with power have the right to abuse those without it: that might somehow does make right. Whether for profit, convenience, or just plain amusement, this supremacist attitude caused people as a society to tolerate, perpetuate, and indignantly defend outrageously cruel acts.

(*ALP* at 1).

Some of the *ALP* WebPages use words (e.g., "Hanging") in a large color font with

---

**3.** The *ALP* is found as Exhibit 40 to the Langer Declaration with internal pagination of "PETA 000001" *et seq.* For ease, it will be referred to as "*ALP* at ——."

**4.** IDEA disputes PETA's claim that *ALP* is an outgrowth of PETA's earlier work. This dispute is not material to the disposition of this motion.

a quote underneath (e.g., from Dick Gregory) and then side-by-side photos relating to slavery and animals (e.g., the lynchings of African Americans and a hanging carcass of a steer). (*See e.g., ALP* at 15.) The side-by-side photos feature scenes of animal mistreatment next to a depiction of a purported human analogue. For example, on one page there is an illustration of the shackled foot of a slave next to a photo of an elephant's foot in shackles. (*ALP* at 9.) Another page of the *ALP* contains a drawing of a slave branding scene that has elements in common with a branding drawing in the *TDC* (e.g., the person holding the branding iron has a striped shirt and moustache, has the device in his right hand and has it placed at the back of topless African female with a white clothe wrapped around her lower torso; a boy stands next to them holding a lantern). (*ALP* at 29; *TDC* at 29.) The pages containing comparative photos also contain quotes. One page entitled "Beaten," includes a quote from Peter Singer that does not also appear in *TDC*. (*ALP* at 10.) Another page includes a quote from John Stuart Mill, also not appearing in *TDC*. (*Id.* at 12.) A page entitled "Hanging," contains a quote from Dick Gregory; a lengthier version of the quote from Gregory appears in *TDC*. (*Id.* at 15; *TDC* at 108.)

Images and quotations are not used in any consistent manner throughout the 78 pages that constitute the *ALP*. Some pages display only a single image with no comparative image (*see e.g., ALP* at 26, 29, 30, 32, 33, 35, 36, 38, 39, 41, 42, 44, 45, 47, 48), but these images generally correspond to another page on which the same images are shown side-by-side. (*See e.g. ALP* at 25, 28, 31, 34, 37, 40.) Images of the tools of human and animal oppression are displayed on interactive WebPages. (*ALP* at 64–74.) Some quotes appear two to a page. (*See e.g., ALP* at 58–64.) Others are set off in a separate colored box on a page with other text and illustrations. (*Id.* at 2–4.) Some quotes are on pages with headings in large colored lettering. (*See e.g., id.* at 9–14.) Two quotes are on pages with other text, but no other quotes or illustrations. (*See e.g., id.* at 50–51.)

There is no dispute that PETA had access to and knowledge of *TDC*. It favorably reviewed *TDC* in its publications, describing it as "ground-breaking" and a "real eye-opener!" (Langer Decl. Exs. 27 & 49.)

## DISCUSSION

### I. *Summary Judgment Standard*

To give the reader a flavor of this dispute, the defendant's Rule 56.1 Statement of undisputed facts is 173 paragraphs in length. In addition to responding to defendant's Statement, plaintiff offers a 146–paragraph Counter–Statement of its own. While one might suppose that with dueling statements of this length this would not be an ideal case for summary judgment. In actuality, many of the tendered "facts" relate to issues that are not necessary for this Court to reach, such as ownership of a copyright in portions of the book and whether plaintiff could show actual damages.

A motion for summary judgment in a copyright infringement case is governed by the same standards as any other motion made under Rule 56, Fed.R.Civ.P. Only material facts that are not disputed by the non-movant may be accepted as true and all reasonable inferences must be drawn in favor of the non-movant. This Court has not hesitated to deny summary judgment on the issue of substantial similarity in a copyright case where the evidentiary record so warrants. *See, e.g. BMS Entm't/ Heat Music LLC v. Bridges*, 04 Civ. 2584(PKC), 2005 WL 1593013 (S.D.N.Y. July 7, 2005), *reconsideration denied,*

*BMS Entm't/Heat Music LLC v. Bridges,* 04 Civ. 2584(PKC), 2005 WL 2675088 (S.D.N.Y. Oct. 20, 2005). The familiar standards governing a motion under Rule 56 need not be repeated here.

## II. *Plaintiff has Failed to Establish Its Copyright Infringement Claim*

To establish a claim of copyright infringement, IDEA must prove: "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir.2003). While PETA disputes IDEA's ownership of the copyright to the Foreword to *TDC* (a matter later addressed), it otherwise concedes IDEA's ownership of a valid copyright to *TDC.* IDEA has established the first element of an infringement claim.

To establish unauthorized copying, IDEA must prove that its work was " 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.' " *Id.* (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,* 150 F.3d 132, 137 (2d Cir.1998)). The actual copying of the copyrighted work may be demonstrated by either direct or indirect evidence. *See id.* "Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially 'by demonstrating that the person who composed the defendant's work had access to the copyrighted material,' " ... and that there are similarities between the two works that are "probative of copying." *Id.* (quoting *Herzog v. Castle Rock Entm't,* 193 F.3d 1241, 1249 (11th Cir.1999) and *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997)). PETA concedes access but disputes that there are protectable similarities between the two works.

### A. *The Alleged Instance of Actual Copying is Protected Under the "Fair Use" Doctrine*

The Foreword to *TDC* was authored by Alice Walker.[5] It is one and one-quarter pages in length and consists of four paragraphs of about 21 sentences in total. (*TDC* at 13–14.) *ALP* quotes the following two sentences from the Foreword, attributing the quote to Alice Walker and using quotation marks: "The animals of the world exist for their own reasons. They were not made for humans any more than black people were made for whites or women for men." (*ALP* at 81, attached at Zissu Decl. at Ex. 17.)

"[T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. Section 107 of the Copyright Act sets forth the factors that a Court should consider in assessing the fair use defense: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.* In analyzing the application of the defense, "[t]he task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577–78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Each

---

**5.** IDEA asserts that it owns the copyright to the Foreword, but PETA and Ms. Walker dispute this contention. This dispute is not material to the disposition of the pending motion because, for the purposes of the infringement analysis, the Court assumes the truth of the facts tendered by the non-movant that IDEA owns the copyright to the Foreword.

of the factors is explained and discussed in *Blanch v. Koons,* 467 F.3d 244, 251–58 (2d Cir.2006). Fair use is an affirmative defense, thus the burden of proof is on the proponent. *See Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir.1998).

■ The use of the Walker quote in *ALP,* in context, was transformative; it is located on a page with pictures of auctions of animals and slaves with a heading of "Sold Off" in a large blue letters. (*ALP* at 81, attached at Langer Decl., Ex. 11.) The copying was intentional but the source, Alice Walker, was attributed and quotation marks were used. While PETA itself is a nonprofit organization and seeks to educate the public, the *ALP* was used, in part, to solicit donations and, for the purpose of the analysis, I assume that there was a commercial quality to the fund-raising. The nature of the copyrighted work is a book that argues a position based upon facts, some of which are historical; the allegedly infringing work is a website and display boards that also argue a position based upon facts some of which are historical. The amount of material taken from the Foreword is slight and, when viewed as a portion of the overall *TDC* of 128 pages in length, it is an extremely small portion of the text. The Walker quote is so small in comparison to the overall content of *TDC* (and *ALP* ) that it could not have affected the potential market for or value of the *TDC.* Comfortably and without further explication, the fair use defense is established as a matter of law as to the two-sentence Walker quote.[6]

**B.** *The ALP is Not "Substantially Similar" to TDC*

**1.** *Unprotected Elements*

■ As Justice Story famously observed, " '[i]n truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before.' " *Campbell,* 510 U.S. at 575, 114 S.Ct. 1164 (alteration in original) (quoting *Emerson v. Davies,* 8 F.Cas. 615, 619 (No. 4,436) (CCD Mass. 1845)). "The most fundamental axiom of copyright law is that no author may copyright his ideas or the facts he narrates." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 344–45, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (internal quotation marks omitted). The text of the Copyright Act states that "[i]n no case does copyright protection for an original work of authorship extend to any idea … concept … or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). Copyright law does, however, protect a particularized expression of an idea, although the underlying idea itself is not protectable. *See Mattel, Inc. v. Azrak–Hamway Int'l. Inc.,* 724 F.2d 357, 360 (2d Cir.1983).

■ The idea of comparing slavery to treatment of animals (pretermitting the validity and worthiness of such a comparison) is not entitled to copyright protection. As the *TDC* itself, notes, an 1898 publication of the British anti-vivisection movement was first titled "Abolitionist" and later changed to "The Liberator," the name of William Lloyd Garrison's anti-slavery publication. (*TDC* at 100–01.) Also, as noted previously, in 1974, long before *TDC* was written, Peter Singer "compared" the treatment of animals to

---

**6.** This Court will consider the Walker quote in its subsequent infringement analysis in examining whether there has been copying of an original selection of unprotected elements, including in the examination of the overall look and feel of the works.

the "centuries of tyranny by white humans over black humans." (*TDC* at 15; *ALP* at 3.) Plaintiff is entitled to no protection for even intentional copying of the idea of the comparison or in using the comparison to advocate for better treatment of animals.

Nor are the descriptions of historical facts entitled to protection, as long as different forms of expression are used. "Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted." *Feist*, 499 U.S. at 350, 111 S.Ct. 1282. Thus, the basic facts of slavery and the present day treatment of animals receive no copyright treatment.

■■■ Under the *scènes à faire* doctrine, "sequences of events that 'necessarily result from the choice of a setting or situation,' do not enjoy copyright protection." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir.1986)). Thus, for example, a scene describing life in the South Bronx (in the 1980s or earlier) would likely contain "[e]lements such as drunks, prostitutes, vermin and derelict cars" and these elements would not be entitled to copyright protection. *Walker*, 784 F.2d at 50. The *ALP*'s description of the horrid conditions of slaves with reference to terms used in *TDC*, such as branding, lynchings, the Middle Passage, family separations or auctions, do not amount to infringement. The same is true for references to the slaughtering of animals, starving of animals, auctioning of animals, chaining and restraint of animals or use of animals in experimentation; they are not protectable.

### 2. *The Compilation of Unoriginal Elements*

Unoriginal elements, when combined, may constitute an original work entitled to copyright protection. *See Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1004 (2d Cir.1995). In *Knitwaves*, the Court concluded that a sweater's commonplace visual elements—such as leaves and squirrels, a " 'fall' palette" of colors, and a design that combined these images and colors—were sufficiently original in combination to warrant copyright protection. *Id.* The Second Circuit rejected the defendants' contention "that, in comparing designs for copyright infringement, we are required to dissect them into their separate components, and compare only those elements which are in themselves copyrightable." *Id.* at 1003. "As the district judge noted, if we took this argument to its logical conclusion, we might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past." *Id.* (internal quotation marks omitted). Instead, *Knitwaves* emphasized that a court should evaluate a work's "total concept and feel." *Id.* The undersigned has observed that the "unoriginal lyrics of 'Mary Had a Little Lamb' with the unoriginal melody of 'Old McDonald' and an unoriginal reggae beat" could amount to an original work protectable under the copyright law. *BMS Entm't/Heat Music*, 2005 WL 1593013 at *3 n. 2.

■■■ IDEA asserts that within its copyrighted work there are unprotected elements that, when combined, form an original, protectable work copied by PETA. It asserts that the two works are substantially similar. "In most cases, the test for 'substantial similarity' is the so-called 'ordinary observer test' . . . ." i.e., whether "an average lay observer would [ ] recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves*, 71 F.3d at 1002 (internal quotation marks omitted). In applying the ordinary observer test, the Second Circuit has "endorsed the notion that, '[g]ood eyes and common sense may be as useful as deep study of reported and unreported cases, which themselves are tied to highly

particularized facts.'" *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 102 (2d Cir.1999) (quoting *Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.*, 490 F.2d 1092, 1093 (2d Cir.1974)). When comparing two works that "contain both protectible and unprotectible elements ... [the] inspection must be 'more discerning;' we must attempt to extract the unprotectible elements from our consideration and ask whether the *protectible elements, standing alone*, are substantially similar." *Id.* at 1002 (emphasis in original).

IDEA relies upon the report of James Engell, a Professor of English and Comparative Literature at Harvard University. He is an expert on, among other things, the works of Samuel Taylor Coleridge. (Engell Rpt., attached at Langer Decl. Ex. 3.) Professor Engell finds a combination of five distinct and protectable elements in *TDC* that are also present in *ALP*. This Court will discuss each separately and, then, in combination.

"(1) *an argument that human beings with effective power over animals often abuse those animals in a manner comparable to the way humans especially but not exclusively in the case of chattel, race slavery, have abused other humans over whom they have similar power.*" (Engell Rpt. at ¶ 1.)

The two works, indeed, posit the foregoing argument. As noted from the references to the "Abolitionist," "The Liberator" and Peter Singer, these arguments are not original to *TDC*. Moreover, as discussed above, they are unprotectable ideas based largely on facts, many of a historical nature.

"(2) *an explanatory text that elaborates this comparative argument about power, oppression, and abuse from historical, philosophical, and ethical perspectives.*" (*Id.* at ¶ 1.)

The two works are quite different in the manner in which they advance their arguments. *TDC* is a standard softcover book, containing principally text in support of the author's thesis, together with illustrations. *ALP* relies heavily on color and graphics and much less on text. Each makes arguments from history and each advances perspectives that could be characterized as "philosophical," "ethical" or both. PETA is an organization that, in its very name, seeks "ethical treatment of animals." In the absence of copying expression, there is no protectable originality in the abstract proposition of "an explanatory text that elaborates this comparative argument about power, oppression, and abuse from historical, philosophical, and ethical perspectives." (*Id.* at ¶ 1.)

"(3) *quotations, frequently acting as epigraphs for divisions of the text or in conjunction with illustrations, often paired, but otherwise prominently placed or highlighted, and consisting of a grammatically complete sentence or sentences, not short phrases.*" (*Id.* at ¶ 1.)

Both works use quotations and the quotations tend to be sentences, whether or not grammatically complete. *TDC* contains a separate section of the book, six pages in length, titled "What Others Have Said," that contains the text of twelve quotations followed by the name of the person quoted without any explanatory text (with one exception) or illustration. (*TDC* at 107–13.) Some of the quotes are one sentence in length but one is over three pages in length. (*Id.* at 110–13.) These quotes do not serve as epigraphs for divisions of the text. True, some quotes are at the beginning of a chapter, as is commonplace in political or historical works. (*See e.g., id.* at 39.) Some are in the middle of a chapter next to an illustration. (*See e.g. id.* at 42.) Some are in traditional block

quote form with original material preceding and following the quote. (*See e.g., id.* at 25–26, 43.) The *ALP* also uses quotes. One of the quotes in the *ALP,* as discussed above, is a brief and attributed quote from Alice Walker's Foreword in *TDC.* Some of the quotes are placed with one other quote and two illustrations on pages of a faux antique book. (*ALP* at 57–63.) Some are set off in a separate and colored box on a page with other text and illustrations. (*Id.* at 2–4.) Some are on pages with headings in a large colored font (e.g., "Beaten" "Force–Fed" "Liberation"). (*Id.* at 9–16.) Two are on pages with other text, no other quotes and no illustrations. (*Id.* 50–51.) There is nothing original or distinctive in the several and varied ways in which quotes are utilized in the *TDC* that are copied in the *ALP.*

"(4) *division of the work and its explanatory texts into more detailed parallels that compare abusive treatments of animals with specific abusive treatments of race slaves or other people who were at times oppressed (e.g. Native Americans, Jews)."* (Engell Rpt. at ¶ 1.)

Both works contain divisions of themes. The absence of anything original or distinctive in the manner of divisions is well demonstrated by recounting the thirteen chapter headings in *TDC:* An Historical Understanding; Oppression in Language and Literature; Slaves and Masters; Social Relations: The Destruction of Security; Transportation, or The Unbearable Journey; Hunting; Vivisection; In Defense of Slavery; Secrecy: Hiding from the Truth; Profits Over All; Power; Afterword to the Revised Edition; What Others have Said. (*TDC* at "Contents.") While the overall theme of *TDC* is the comparison of animal treatment to slavery and other forms of oppression of humans, the manner in which the work is organized

is not distinctive or original. The central idea of *TDC* is to make a comparison. Unsurprisingly, many comparisons of the facets and features of human oppression and animal treatment are set forth in the book. *ALP* makes comparisons and uses headings to divide subject areas, but it does not do so in a manner that is substantially similar to *TDC.*

"(5) *paired or juxtaposed images, either photographs, prints, or drawings, both recent and historical, that visually compare specific treatments of slaves with specific treatments of animals."* (Engell Rpt. at ¶ 1.)

As noted previously, there is no consistency in how *TDC* presents its illustrations. Some have a comparison illustration on the same page: one depicting slavery and the other relating to animals. (*See e.g., TDC* at 42, 53, 81, 84.) Some such comparative illustrations are on pages that face each other. (*See e.g., id.* at 36–37, 54–55, 66–67, 68–69, 88–89, 92–93, 96–97, 100–01.) Other illustrations are presented in a stand-alone manner with no comparative illustration offered. (*See e.g., id.* at 39, 41, 51, 56, 63, 74.) It is commonplace for a work comparing or contrasting seemingly disparate events or circumstances to contain side-by-side illustrations. For example, it would be strange for an illustrated work comparing World War I artillery with World War II artillery to refrain from displaying comparative images on the same or facing pages.

*ALP* uses illustrations in many and different ways. As noted, some pages display a side-by-side comparison of images (*see e.g. ALP* at 25, 28, 31, 34, 37, 40) followed by a corresponding page on which only one of the two images is displayed. (*Id.* at 26, 29, 30, 32, 33, 35, 36, 38, 39, 41, 42, 44, 45, 47, 48.) Some of the images feature horrific bloody scenes in color.

(*Id.* at 31–33.) Images of the tools of human and animal oppression (chicken shackles, prisoner restraints, castrator, scissors and razors, branding irons) are displayed on interactive WebPages. (*Id.* at 64–74.) There is nothing original or distinctive about the use of illustrations in either *TDC* or the *ALP*. As noted, side-by-side comparisons of things asserted to be similar are commonplace.

Of course, *Knitwaves* teaches that unprotected elements, when combined, may become an original and protectable feature of a work. "[T]he original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work" is protectable. 71 F.3d at 1004 (quoting *Feist,* 499 U.S. at 358, 111 S.Ct. 1282). The "total concept and feel" of the two works must be similar. *Id.* at 1003–04. Insofar as unprotected elements in *TDC* (that are found or said to be found in *ALP* ) are combined, there is no resulting originality.

For example, few in Western literature have been the subject of more written works than Abraham Lincoln, who, incidentally, is quoted in *TDC*. (*TDC* at 109.) Biographies of Lincoln can be expected to contain common combinations of unprotected elements, such as (1) divisions of the periods of Lincoln's life (work on the river, work as lawyer, his presidential candidacy, frustration over the conduct of the war, the Emancipation Proclamation, the assassination), (2) usage of quotes by Lincoln or about Lincoln by a relatively small assemblage of contemporaries, (3) comparisons and contrasts to other famous personages, such as George Washington, William Seward or Stephen A. Douglas, (4) a selection of photographs, many taken by Matthew Brady, and (5) a speculative dis-

course explaining why the Reconstruction era would have been different if Lincoln had lived, usually suggesting that it would have been more harmonious and that greater social progress would have been made. Yet, the combination of these unoriginal elements would not ordinarily become original and protectable.[7]

In the arena of public debate, it is common to compare a contemporary event, political movement or public figure to a historical antecedent. The fact of the comparison, coupled with the use of side-by-side images, quotations and divisions into subtopics, may often be so commonplace and unoriginal that even when all these elements are combined, they do not form an original, protectable work. This is such an instance.

"Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Feist,* 499 U.S. at 348, 111 S.Ct. 1282. Viewing the facts in a light most favorable to the plaintiff, no reasonable jury, properly charged on the law, could find that PETA engaged in unauthorized copying of original components of IDEA'S copyrighted work, or an unlawful copying of a combination of unprotected elements. The "total concept and feel" of *TDC* and *ALP* are, for reasons explained, different.

CONCLUSION

For the reasons outlined above, defendant's motion for summary judgment is GRANTED.

SO ORDERED.

---

**7.** Of course, the author's particularized expression of ideas about Lincoln would be protectable and one Lincoln book could in other respects copy the "total concept and feel" of another.